WILLIAM M. NARUS, CAB #243633
Acting United States Attorney
District of Oregon
**WILLIAM M. McLAREN, OSB #143836**
William.McLaren@usdoj.gov
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division
**STEPHEN J. FOSTER, VAB #83893**
Stephen.Foster@usdoj.gov
Trial Attorney, Environmental Crimes Section
Environment and Natural Resources Division
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **6:24-cr-00441-MC** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **J.H. BAXTER & CO., INC.,** **J.H. BAXTER & CO., A CALIFORNIA LIMITED PARTNERSHIP, and** **GEORGIA BAXTER-KRAUSE,** | **Sentencing:  April 22, 2025 at 1:30 p.m.** |
| **Defendants.** | |

For years, J.H. Baxter & Co., Inc., and J.H. Baxter & Co., A California Limited

Partnership (collectively, "J.H. Baxter"), under the leadership of Georgia Baxter-Krause,

engaged in the illegal treatment of hazardous waste.  Rather than properly handling the waste

using dedicated treatment equipment, J.H. Baxter repurposed large metal cylinders—retorts—

**Government's Sentencing Memorandum**                                                              **Page 1**

meant for pressure treating wood at high temperatures and simply boiled its waste into the air. The investigation revealed this conduct was known to J.H. Baxter employees and management, from the president down to the retort operators.

Despite alerts about equipment failure and the need for capital upgrades, the evidence reflects those warnings went unheeded by J.H. Baxter's leadership for years. And by early 2019, this illegal boiling became the company's sole method for treating their hazardous wastewater. After authorities ultimately discovered the practice, Ms. Baxter-Krause attempted to hide and minimize the extent of the conduct by providing false statements to a state inspector. As a result of this conduct, the defendants potentially put members of the nearby community at risk.

For the reasons set forth below, the government recommends the Court sentence Ms. Baxter-Krause to twelve months and one day of imprisonment and pay the parties' agreed-upon criminal fine of $500,000. The government further recommends the Court sentence J.H. Baxter to pay fines of $1,000,000 (jointly and severally between the two entities) and to serve a five-year term of probation.

## FACTUAL BACKGROUND

The offense conduct is accurately set forth in paragraphs 23 through 36 of the Pre-sentence Investigation Report associated with defendant Georgia Baxter-Krause ("Baxter-Krause PSR"), and 20 through 33 of the PSRs associated with the J.H. Baxter defendants ("JHB PSR").

Below is a summarized description of the factual background. Given the relative infrequency of these charges in this Court,[1] some additional regulatory and factual background is summarized below.

---

[1]    A similar past example, though on a much smaller scale, can be found in *United States v. Johnson et al*, 3:19-cr-00238-HZ (D. Or. 2019). That and other similar cases are detailed below.

A.    **Regulatory Overview**

Congress passed the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*, to minimize the threat to human health and the environment from hazardous waste. 42 U.S.C. § 6901 *et seq*. A cornerstone of the statute is a requirement for any facility which treats, stores (beyond a prescribed period of time), or disposes of hazardous waste, to obtain and comply with a permit. Relevant here, the wood preservation process produces wastes that are listed as hazardous. *See* 40 C.F.R. §§ 261.30 and 261.31.

A purpose of the Clean Air Act, on the other hand, is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1); *see also* 42 U.S.C. § 7470. Hazardous air pollutants are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. Congress directed the establishment of standards for certain sources of hazardous air pollutants. 42 U.S.C. § 7412(d)(1). Such standards are commonly referred to as the National Emission Standards for Hazardous Air Pollutants (NESHAP). NESHAPs have been enacted for many sources of hazardous air pollutants, including wood preservation facilities like that operated by J.H. Baxter.

B.    **History of the J.H. Baxter Facility**

From about 1943 to 2022, J.H. Baxter owned and operated numerous wood treatment facilities, including its facility in Eugene, Oregon ("Facility"). JHB PSR ¶ 20. The Eugene J.H. Baxter Facility is situated in an industrial area directly abutting a low-density residential community, the Bethel Neighborhood, as depicted below (in purple):



*Approximate land use layout in the area of the J.H. Baxter Facility[2]*

Since 2001, Ms. Baxter-Krause has identified herself as the President of J.H. Baxter.

Baxter-Krause PSR ¶ 30. As part of its wood treatment process, the Facility used several

hazardous chemicals to treat and preserve wood. JHB PSR ¶ 27. Facility personnel would insert

quantities of untreated dimensional or laminated lumber into large, sealable, cylindrical devices

called "retorts," along with treating chemicals. JHB PSR ¶ 27. The retorts were then sealed to

allow wood to absorb the treating chemicals under pressure. JHB PSR ¶ 27. A photograph of a

retort, taken during an inspection and loaded with dimensional lumber is depicted below:

---

[2]      Graphic courtesy of an informational "StoryMap" prepared by the Pacific Northwest
Center for Translational Environmental Health Sciences Research at Oregon State University, in
association with the Oregon Department of Environmental Quality (ODEQ), the Lane Regional
Air Protection Agency (LRAPA), the Oregon Health Authority (OHA), and the City of Eugene
(last accessed Apr. 15, 2025), *available at*
https://storymaps.arcgis.com/stories/61e11e3a99a54ff784a68ffacaccffcc\.

**Government's Sentencing Memorandum**                                              **Page 4**



The chemicals used by J.H. Baxter to treat the wood included pentachlorophenol ("penta"), creosote, and ammoniacal copper zinc arsenate (ACZA). JHB PSR ¶ 27. ACZA consists of arsenic pentoxide among other constituents. JHB PSR ¶ 27. The Facility's wastewaters, process residuals, preservative drippage, and spent formulations from the wood preserving processes were listed hazardous wastes under RCRA. JHB PSR ¶ 27. Such wastes are considered hazardous based on their toxic constituents. 40 C.F.R. §§ 261.30 and 261.31.

For years, when J.H. Baxter's Facility had too much water on site, including process wastewater and precipitation, the employees at the Facility transferred hazardous process wastewater to an available wood treatment retort to "boil it off" or evaporate it. JHB PSR ¶ 29. The retorts were left to boil until the volume of wastewater within the retort was greatly reduced. JHB PSR ¶ 29. Additionally, in an effort to maximize the boiling rate of the process wastewater,

employees were directed to open all vents on the retorts, allowing discharge to the surrounding air. JHB PSR ¶ 30, ECF Nos. 27 & 29 at 3. J.H. Baxter did not have a permit to treat its hazardous waste in this manner, and neither the state nor regional permitting agencies for air pollution and hazardous waste were made aware of the process. JHB PSR ¶ 29.

### C.    J.H. Baxter's Wastewater Treatment System was Failing for Years

The proper method for treating J.H. Baxter's hazardous wastewater was not boiling it off in a retort designed for wood treatment. Rather, the Facility had an on-site wastewater treatment unit (WWTU) that provided a lawful means to treat and evaporate waste. *See* ECF No. 27 & 29 at 3, ¶ 2. However, personnel at J.H. Baxter knew that the Facility's water treatment system was on the fritz for years. Emails between and from J.H. Baxter personnel, including some directed at Georgia Baxter-Krause, revealed relevant alerts to the companies' leadership. For example, the following email was received by Ms. Baxter-Krause on November 15, 2016:

> *While they were here,* [individual] *and I went over to the evaporator to talk about how to evaporate more efficiently and* [individual] *noticed we have a few steam leaks. . . . So we went back to the office and met with the other engineer and he got involved with the evaporator discussion. . . . This will allow us to operate the evaporator fewer hours which not only saves natural gas, and also reduces odors.*

Gov. Sealed Ex. 1 (J.H. Baxter's corporate emails) at 1.[3]

In 2017, Facility personnel discussed upgrading or replacing the evaporator, including asking on-site management, "Where did the evaporator end up on the 2018 [capital expenditure] priority list?"[4] Gov. Sealed Ex. 1 at 2. The evidence reflects that 2018 came and went, and in

---

[3]    Government's Exhibit 1 is filed under seal given that many emails referenced are sent or received by individuals who are not parties to this matter, as are individuals who were referenced in, copied on, or forwarded emails. Excerpts involving Ms. Baxter-Krause and relevant to this filing are noted herein.

[4]    This particular email was not sent to Ms. Baxter-Krause.

**Government's Sentencing Memorandum**                                      **Page 6**

October of that year, Ms. Baxter-Krause received the following email from a manager at J.H.

Baxter's Eugene facility:

> *The process water system is struggling to keep up with the volume of water because we've slowed down the flow rate to keep from 'throwing' flock and plugging up the carbon and sand filters. . . . Process water is going to operate the same as it has for the last number of years until we put some capital into it to change and improve the system. It doesn't need small fixes; it needs a re-design.*

Gov. Sealed Ex. 1 at 5–6. Ms. Baxter-Krause responded the same day, "[i]t's probably time to

start getting some estimates to improve/ redesign the system." Gov. Sealed Ex. 1 at 5.

The alerts to corporate leadership persisted into the following year. In one email to upper

management, which was forwarded to Ms. Baxter-Krause on March 4, 2019 (Gov. Sealed Ex. 1

at 7), the Facility's on-site engineer shared the following:

> *We are flooded. When I came in this morning, water has started to flood the boiler room floor. In addition, we completely flooded the 83 basement and submerged roughly $20,000 dollars in motors in 1.5 days while no one was onsite. . . . To help combat that situation, we are completely filling up retorts 81 and 82 with water and will begin boiling as soon as we have gas service. . . . As you can see, we are currently in a significant evaporating deficit which is why we are in our current situation. . . . I know it will be an expensive project, but I think we need to replace the evaporate* [sic] *in 2019 or else our water problems will only get worse as the evaporator performance continues to decline.*

Gov. Sealed Ex. 1 at 8–9.

Following that alert, on-site J.H. Baxter personnel regularly communicated on the state of

process wastewater disposal—they urged rapid boiling of wastewater pending the installation of

a new evaporator. A series of emails from March through April 2019 memorialized the process:

> March 22, 2019, email: *We have permanently turned off the evaporator as we are now trying to eliminate our boiler water contamination problem. We will continue to boil water in a retort as long as necessary until we have a new evaporator.*

> April 5, 2019, email: *Other than that, boil water in 83 AS FAST AS POSSIBLE and keep process running and 83 topped off from C tank. . . .*

> April 16, 2019, email: *I have noticed that almost every day when I come in the 83 plume is small because the vent valves are choked off. The retort boils water*

> *quickest when they are all the way open. Unless you are actively filing* [sic] *the retort or it's spitting out bad, the vents need to be left open to maximize the boiling rate. I'm unsure who keeps closing them or why they keep getting closed but it needs to stop . . . .*

These emails were directed between an on-site engineer and J.H. Baxter's boiler room personnel. *See* Gov. Sealed Ex. 1 at 13–15. While Ms. Baxter-Krause was not included on the above three communications, personnel made clear to her and other leadership that the Facility was left with no option but to engage in unlawful treatment by boiling waste, as illustrated in the below email:

> *The evaporator being non-operational, to me, is one of the most important issues we have now. Not being able to evaporate rain/process water without using a retort is a problem.*

Gov. Sealed Ex. 1 at 16 (this email was received by Ms. Baxter-Krause on April 24, 2019).

### D. Baxter-Krause's Awareness of Waste Boiling Prior to Inspectors' Discovery

While Ms. Baxter-Krause was the company's president, and was onsite periodically, the evidence does not reflect that she was present for daily operations. Nonetheless, the investigation revealed that she was part of regular meetings, advised of major happenings, and was consulted with—directly—about the specifics of boiling hazardous waste in the Facility's retorts.

One particular email string illustrates the degree of Ms. Baxter-Krause's knowledge and involvement. On July 8, 2019, a Facility manager emailed Ms. Baxter-Krause with an update that included:

> *We've been boiling off water in retort 85 for the last 6 weeks. The attached pictures show the "stuff" that's in the bottom of the retort that we need to wash and shovel out. What should we label the barrels, as penta/creo or as the same as the process water bin?*

Gov. Sealed Ex. 1 at 17. The manager sent Ms. Baxter-Krause the photograph below along with her question:



*Photograph sent to Georgia Baxter-Krause on July 8, 2019, depicting the inside of a J.H. Baxter retort after weeks of boiling hazardous waste.* Gov. Sealed Ex. 1 at 18.

Later that morning, in response to the above question and photo, Ms. Baxter-Krause sent

the following email identifying the type of sludge left after the rest of the waste was boiled off:

| From: | Georgia Baxter [/O=EXG7/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8BE8BE974B2540339261F0F5EC1003EE-GBAXTER] |
|---|---|
| Sent: | 7/8/2019 9:58:39 AM |
| To: | [Adult Witness 1] |
| Subject: | RE: 85... |

Please label it Penta/Creo Process waste.

*Georgia Baxter-Krause's response on July 8, 2019, sent in response to a facility manager's question about what to label the barrels of sludge left once the rest of the waste had been boiled. See Gov. Sealed Ex. 1 at 19. The manager's name has been anonymized.*

Though "Penta/Creo Process waste" is not an exact hazardous waste title under the law, Ms. Baxter-Krause's phrasing is consistent with a specific hazardous waste, "K001 – Bottom sediment sludge from the treatment of wastewaters from wood preserving processes that use creosote and/or pentachlorophenol." *See* 40 C.F.R. § 261.32(a). That waste is toxic.[5]

### E.    Baxter-Krause's False Statements Following Regulators' Discovery

An investigator with the Lane Regional Air Protection Agency (LRAPA) discovered the existence of the waste-boiling practice in Fall 2019. The following year, a hazardous waste compliance inspector with the Oregon Department of Environmental Quality (ODEQ) was investigating the above-described boiling process. On September 3, 2020, the inspector sent an information request to Ms. Baxter-Krause, seeking information about how the retorts were used to evaporate hazardous waste. Baxter-Krause PSR ¶ 33. Among the questions regarding the use of retorts to boil off waste, the inspector asked the following:

> *How many occasions (estimated) has this practice been conducted. Provide dates/years when possible or indicate if it's a seasonal practice (i.e. each winter).*
>
> *Are records kept for this process? If so, please submit them within the timeline below.*

*Id.* On September 28, 2020, Ms. Baxter-Krause signed and sent a letter responding to the information request. With respect to the "Process Water Evaporation in Retorts," Ms. Baxter-Krause's letter stated, in relevant part, "[J.H.] Baxter does not have specific dates when this practice occurred; it was a seasonal practice and occurred occasionally during the rainy season,

---

[5]    The United States Environmental Protection Agency (EPA) describes wastes that are hazardous due to the toxicity characteristic as being harmful when ingested or absorbed, and toxic wastes present the concern that they may be able to leach from waste and pollute groundwater. *See* U.S. ENVIRONMENTAL PROTECTION AGENCY, *Defining Hazardous Waste: Listed, Characteristic, and Mixed Radiological Wastes* (last accessed April 14, 2025), available at https://www.epa.gov/hw/defining-hazardous-waste-listed-characteristic-and-mixed-radiological-wastes; *see also* 40 C.F.R. § 261.24.

primarily during heavy rain events when the holding tanks were at capacity." Additionally, the letter referred only to retort 81 being used for boiling and made no reference to records being kept for the treatment practice. Baxter-Krause PSR ¶ 34.

Two days later, on September 30, 2020, the hazardous waste inspector asked Ms. Baxter-Krause, via email, "I also wonder if other retorts were used to evaporate process wastewater and if so which ones?" Ms. Baxter-Krause responded within minutes of receiving the email, stating, in relevant part, "No other retorts were used." Baxter-Krause PSR ¶ 35.

In truth, and as known to Ms. Baxter-Krause, J.H. Baxter maintained detailed daily production logs for each retort. These logs were prepared and maintained by J.H. Baxter's employees at the Facility. The logs included the notes "BOILING OFF WATER" or "WATER IN RETORT" to indicate which retorts were being used to boil wastewater each day. Those logs showed that from approximately January 2, 2019, to October 6, 2019, J.H. Baxter boiled off hazardous process wastewater in its wood treatment retorts on 136 known days. During this time, and as known by Ms. Baxter-Krause, J.H. Baxter used four of its five retorts, including 81, 82, 83, and 85 to boil off process wastewater. Baxter-Krause PSR ¶¶ 35-36.

**PLEA AGREEMENT AND GUIDELINES COMPUTATIONS**

On January 22, 2025, Ms. Baxter-Krause pleaded guilty to an Information on behalf of herself and the corporate entities. The Information charges each of the J.H. Baxter companies with a felony count of Illegal Treatment of Hazardous Waste, in violation of 42 U.S.C. § 6928(d)(2)(A), as well as a felony count of Violating the Clean Air Act's National Emission Standards for Hazardous Air Pollutants, in violation of 42 U.S.C. § 7413(c)(1).

Ms. Baxter-Krause was charged with two felony counts of RCRA False Statements, in violation of 42 U.S.C. § 6928(d)(3).

The government agrees with Probation's guidelines computations, as set forth in the PSR at ¶¶ 44–54, charted below for the Court's ease of reference:

| Enhancement | Guidelines |
|---|---|
| Base Offense Level, USSG § 2Q1.2(a) | 8 |
| On-Going or Repetitive Release, USSG § 2Q1.2(b)(1)(A) | +6 |
| Without a Permit, USSG 2Q1.2(b)(4) | +4 |
| Acceptance of responsibility, USSG § 3E1.1(a) and (b) | -3 |
| Zero-Point Offender, USSG § 4C1.1 | -2 |
| **Adjusted Offense Level** | **13** |

The foregoing guidelines calculation yields an advisory sentencing range of 12 to 18 months' imprisonment.  The maximum term of imprisonment for providing a false statement under RCRA is two years.  42 U.S.C. § 6928(d).  Consistent with the parties' plea agreement and for the reasons set forth below, the government recommends a term of imprisonment of twelve months and one day for Ms. Baxter-Krause.

The illegal treatment of hazardous waste by an organization carries a penalty of a fine of not more than $50,000 per day of violation.  42 U.S.C. § 6928(d)(2)(A).  Here, J.H. Baxter illegally treated hazardous waste on 136 known days.  Thus, the maximum possible penalty for the company is $6.8 million.

Additionally, 18 U.S.C. § 3571, authorizes a maximum fine of the amount specified in the statute of conviction, the amount set forth in Section 3571 (up to $250,000 for an individual, and up to $500,000 for an organization), or twice the gross gain or loss from such offense, whichever is greater.  RCRA does not exempt by specific reference Title 18 fines.  Accordingly, fines may be imposed under RCRA or 18 U.S.C. § 3571.

**Government's Sentencing Memorandum**                                                                 **Page 12**

The guidelines state that the court shall impose a fine in all cases, except where a defendant establishes inability to pay and unlikeliness to become able to pay any fine. *See* USSG § 5E1.2(a). However, the guidelines do not indicate an advisory range for fines to be paid by organizations for environmental offenses. *See* USSG § 8C2.1. Thus, the Court must refer to the sentencing considerations enumerated at 18 U.S.C. §§ 3553 and 3572. *See* USSG § 8C2.10.

Given the factors set forth below, the parties jointly recommend that the Court sentence Ms. Baxter-Krause to pay a fine of $250,000 each for Counts 3 and 4, for a total of $500,000. Further, the parties jointly recommend that the two J.H. Baxter entities pay a criminal fine of $1,000,000, jointly and severally between J.H. Baxter & Co., Inc., and J.H. Baxter & Co., A California Limited Partnership. At the time of the change of plea in this matter, the Court inquired as to the final destination of criminal fines when ordered. Criminal fines, with some limited exceptions, when paid, are directed to the Crime Victims Fund ("Fund"). 34 U.S.C. § 20101(b)(1). The Fund is managed by the U.S. Treasury and parts of it are allocated to federal, state, and Tribal victim assistance programs by way of grants, set-asides, and other processes.[6]

## RESTITUTION

Pursuant to the Order Authorizing Notification to Potential Crime Victims, entered by this Court on April 10, 2024, in case no. 6:24-mc-387, the government has provided notice to potential victims as required by the Crime Victims' Rights Act, 18 U.S.C. § 3771, and has undertaken air modeling and toxicology analysis to determine potential harm resulting from the above-described criminal activity. *See* Gov. Exs. 2 (air modeling) and 3 (toxicology).

---

[6]    *See* U.S. DEPARTMENT OF JUSTICE, OFFICE FOR VICTIMS OF CRIMES, *Crimes Victim Fund Overview* (last accessed April 14, 2025), *available at* https://ovc.ojp.gov/about/crime-victims-fund#allocation-process.

**Government's Sentencing Memorandum**                                    **Page 13**

To date, the government has received responses from current and former community members with associated restitution requests in the amount of $10,388,504, as detailed in the confidential letter provided to the Court on April 16, 2025. As stated in the underlying plea agreement in this matter, based on currently-submitted victim impact information as well as the findings associated with Gov. Exs. 2 and 3, and specific to the criminal conduct outlined above, the government will not be seeking a restitution judgment against the defendants in this case. The Court maintains sole discretion whether the defendants are liable for restitution. *See* 18 U.S.C. §§ 3663(a)(3), 3563(b)(2) and 3583(d); USSG § 5E1.1; Baxter-Krause PSR at ¶ 98.

As part of its investigation, and to understand the potential risk to the community, the government attempted to determine the likely emissions specifically associated with J.H. Baxter's waste boiling practice on the known days by way of statistical air modeling. *See* Gov. Ex. 2 ("Venner Report"). The government took the results of that modeling to determine if a toxicologist could specify risk to humans as a result of exposure to the modeled chemicals during the known timeframe. *See* Gov. Ex. 3 ("Keteles Report"). The Venner Report (Tables 1 and 6) estimated a total of 644,309 gallons of a mix of water types, including rainfall, stormwater, and process wastewater from wood treatment, were boiled off, and that 28 chemicals were likely emitted from the practice. The Keteles Report assessed the potential risk of adverse health effects, including cancer, of the modeled exposure concentrations from the Venner Report and determined that there does not appear to be an appreciable risk of adverse health effects for some chemicals, and for other chemicals, there is insufficient toxicity information. Dr. Keteles could not rule out risk to the community near J.H. Baxter but could not establish said risk to a degree of scientific certainty based on Dr. Venner's emissions modeling.

Despite Dr. Keteles' inability to verify or prove human health outcomes as a result of the particular activity charged in this case (in part due to a lack of toxicological comparative data), components of the waste J.H. Baxter boiled were toxic.  Additionally, Dr. Keteles' report makes clear that risk to the nearby community cannot be ruled out based on the air modeling. *See* Gov. Ex. 3 at 1, 3, 4.  Nonetheless, based on the available scientific information specific to the dates and particular activity at issue in the charging instrument in this case, the government is unable to meet its burden to support the restitution requests submitted in this matter.

## COMPARABLE CASES AND SENTENCES

In determining a sufficient sentence, the law emphasizes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a), (a)(6).  The circumstances of environmental crimes do not lend to simple comparisons.  Varying factors can include the sophistication of a defendant, the duration and number of violations, the violations' seriousness, the breadth of the criminal conduct, and whether a company or individual engages in fraudulent or misleading conduct along with or in the absence of a substantive violation.  The government points this Court to a non-exhaustive sampling of RCRA false statement cases to provide a range of conduct and sentences to assist the Court's consideration of the appropriate sentence in this case.

A recent instance of a RCRA false statements case in the District of Hawaii concerned an individual who agreed to remove hazardous waste drums from a company's site.  Instead of taking them to a proper disposal facility, he took them to a warehouse he owned and stored them there, without authorization.  He and the company he was working with gave regulators false RCRA paperwork and then lied when questioned about the activity.  The court sentenced him to

63 months' imprisonment following a guilty plea. *United States v. Gilstrap*, Case No. 21-cr-00134 (D. Hi. Jan. 17, 2024).[7]

Another RCRA case, *United States v. Stone Castle Recycling et al.*, 1:17-cr-00044 (D. Ut. 2019), involved an electronic recycling company owner who pleaded guilty to improper hazardous waste storage and an employee who pleaded guilty to a RCRA false statement similar to the one made here. The owner was advised of the toxic nature of the electronics being disposed of. The employee then shopped for disposal sites for 152,000 pounds of hazardous, lead-contaminated television components called cathode ray tubes (CRTs). He contacted a landfill that accepted non-hazardous and hazardous waste but charged a premium to dispose of the latter given the rigors of proper hazardous waste disposal. The employee falsely certified the CRTs as a non-hazardous waste, despite his and the owner's knowledge to the contrary. He was accordingly sentenced to 48 months' probation for that charge. The owner of the company was sentenced to twelve months and one day of imprisonment and ordered to pay a $226,791 fine.

Other RCRA false statement cases involve company employees providing altered records to waste inspectors. In *United States v. Howe*, 1:12-cr-00095 (D.N.H. 2013), an office manager at a metal finishing company admitted to whiting out records to conceal their contents from inspectors. The office manager was charged and sentenced to twelve months' probation and ordered to pay a $1,000 fine. In a similar case, *United States v. Ricci*, 1:08-cr-00130 (D.R.I. 2009), an employee of a metal plating facility admitted to providing falsified "weekly

---

[7]    The severity of the sentence in the *Gilstrap* case was likely reflective of the fact that Mr. Gilstrap also pleaded guilty to possession of a stolen firearm, in violation of 18 U.S.C. §922(j). *See* U.S. DEPARTMENT OF JUSTICE, OFFICE OF PUBLIC AFFAIRS, *Man Sentenced to More Than Five Years in Prison for Illegally Handling Hazardous Waste in Hawaii and Possessing a Stolen Firearm in Kansas* (Jan. 17, 2024), *available at* https://www.justice.gov/archives/opa/pr/man-sentenced-more-five-years-prison-illegally-handling-hazardous-waste-hawaii-and.

inspection" logs to compliance authorities.  For that offense, the employee was sentenced to twelve months' probation and ordered to pay a $2,500 fine.

The most recent hazardous waste false statements case filed and sentenced in the District of Oregon is *United States v. Johnson et al.*, Case No. 3:19-cr-00238-HZ (D. Or. 2019).  In that case, the owner of a metal plating company, Kenneth C. Johnson, solicited a $40,000 bid from a hazardous waste disposal company to remove 84 drums of hazardous wastewater.  The following month, he solicited another bid to remove 84 drums of wastewater, but this time represented that the drums contained non-hazardous materials.  The second company issued an $8,000 bid and Johnson accepted it.  He pleaded guilty to making a false statement in violation of RCRA.  The government recommended five years' probation and a $22,640 fine, which the Court imposed. Notably, Mr. Johnson was 79 years old and in ill health at the time of sentencing.  He passed away the following year.

In this case, Ms. Baxter-Krause's responses to regulators are most comparable to that of *Gilstrap* or *Stone Castle Recycling*, in that Ms. Baxter-Krause knew of the broad practice of boiling waste in several different retorts and that the company kept records of boiling that occurred on at least 136 days over the course of the year.  Unlike *Howe* and *Ricci*, which involved employees providing falsified records, Ms. Baxter-Krause served as company president and sent a signed letter to the inspector who inquired about the illegal boiling practice.

Beyond this case's similarities to other RCRA false statements cases, the evidence establishes that Ms. Baxter-Krause had relevant education, a past environmental compliance role, and independent knowledge of the hazardousness of the sludge left behind after 6 weeks of boiling—as depicted above—and even instructed the Facility manager as to the accurate waste

listing.  Ms. Baxter-Krause's degree of knowledge about the unlawful practice, taken with her degree of evasiveness when confronted with it, frame the need for accountability.

## GOVERNMENT'S RECOMMENDED SENTENCE

The potential risks of J.H. Baxter's rapid waste boiling are manifest.  Even absent unlawful hazardous waste treatment, communities situated near wood treatment facilities face increased risks of mucous membrane and skin irritation, asthma and bronchitis, neurological symptoms, and even cancer. *See* Exhibit 3 at 3.  Boiling the chemical stew that resulted from the companies' waste-producing activities only contributed to that risk.

Ms. Baxter-Krause, as President of J.H. Baxter, was well aware of what chemicals were being used to treat wood at the Eugene facility.  She was also repeatedly informed of the boiling-off of the remaining hazardous wastewaters yet seemingly showed no regard for its potential impacts to J.H. Baxter's employees or the surrounding community.  She then attempted to conceal the full breadth of these crimes when confronted by inspectors.

Prior to its 2022 closure, which occurred during the pendency of the investigation, J.H. Baxter was long the subject of neighbors' odor and health complaints. *See* StoryMap, *supra* note 2 (discussing air quality complaints).  This criminal action does not incorporate or arise from all of J.H. Baxter's troubled history in West Eugene.[8]  Instead, this case turns on a ten-month period

---

[8]     J.H. Baxter's history of environmental issues and non-compliance since the year 2000 includes: (1) Notices of Civil Penalty Assessment for violating waste discharge limits issued by ODEQ in 2000 and 2002; (2) a Notice of Non-Compliance for exceeding fuel oil permit levels issued by LRAPA in 2004; (3) a Notice of Non-Compliance for failure to perform routine emission testing issued by LRAPA in 2011; (4) a Notice of Non-Compliance regarding carbon adsorption unit issued by LRAPA in 2012; (5) a Notice of Violation for RCRA violations issued by the EPA in 2017; and (6) a Notice of Civil Penalty Assessment regarding effluent limits and water quality issued by ODEQ in 2018.  *See* StoryMap, *supra* note 2; *see also* U.S. Environmental Protection Agency, Region 10, Notice of Violation, ORD 00903 2400 (July 20, 2017) (last accessed April 15, 2025) *available at* https://ormswd2.synergydcs.com/HPRMWebDrawer/Record/6303855/File/document.

of provable air and hazardous waste offenses—from January through October 2019—as well as Ms. Baxter-Krause's choice to lie to inspectors when the company's illegal hazardous waste boiling scheme was discovered. The parties agree as to a five-year term of probation for the companies, as well as the fines for both the companies and Ms. Baxter-Krause. The parties disagree as to whether a term of imprisonment should be issued.

There are many companies in the United States that produce hazardous waste as part of their normal operations. This means there are just as many business owners faced with a choice about how best to manage that waste. The right way involves using designated equipment, tracking methods, and disposal techniques. The wrong way, in this case, involved re-purposing on-site pressure cookers designed to treat wood with preservatives in a sealed, vacuum-pumped container. Instead of adding wood, though, Ms. Baxter-Krause's company added liquid hazardous waste, popped open the vents, and boiled it into the atmosphere. Ms. Baxter-Krause had been the companies' president since 2001 and, under her leadership, J.H. Baxter repeatedly chose to treat its hazardous waste the wrong way.

The evidence reflects that Ms. Baxter-Krause was aware of the practice of boiling water in retorts as far back as 2016, if not further. Employees interviewed by investigators explained that there was no written procedure for the practice, and they essentially chose a retort that was not in use and would not affect production of preserved wood. Those same employees worked to inform J.H. Baxter's corporate management of the need to upgrade the WWTU as far back as 2017. While Ms. Baxter-Krause, in 2018, gave the go ahead to "start getting some estimates to improve/redesign the system," Gov. Sealed Ex. 1 at 5, the Facility's dedicated evaporator limped along for another year until it went completely offline in March 2019, leaving boiling in the retorts as J.H. Baxter's sole method for treating hazardous waste for six more months.

When the Oregon Department of Environmental Quality confronted Ms. Baxter-Krause about the boiling practice, she made two material misrepresentations.

First, in her letter, she claimed that J.H. Baxter did not have specific dates when the retorts were used. That was not true. The Facility's evaporator had been down since March 2019, and using retorts was the company's sole method of evaporating process wastewater. Georgia Baxter-Krause knew that. *See* Gov. Sealed Ex. 1 at 16 (J.H. Baxter's environmental manager declaring, on April 24, 2019, that the non-operational evaporator was one of the most important issues facing the company). J.H. Baxter, in fact, kept detailed spreadsheets reflecting that specific retorts were being used for "BOILING OFF WATER"—and there were entries every month from Dec. 2018 through Sep. 2019.

Second, when the inspector asked whether the boiling extended to retorts beyond the discovered retort ("81"), Ms. Baxter-Krause claimed via email, "No other retorts were used." That was not true. J.H. Baxter used retorts 81, 82, 83, and 85 to evaporate wastewater, and the emails on which Ms. Baxter-Krause was a recipient reflect that fact. *See, e.g.*, Gov. Sealed Ex. 1 at 17–19 (Ms. Baxter-Krause discussing boiling in, and waste removal from, retort 85); *id.* at 5–6 (notifying of boiling in 82, forwarded to Ms. Baxter-Krause); *id.* at 20 (notifying of boiling in 83, forwarded to Ms. Baxter-Krause).

These are not technical misstatements, nor are they clumsy slip-ups of a disconnected and distant company president. Ms. Baxter-Krause had been included on pivotal emails, notifications, requests, and updates. The email sent along with the sludge photograph above belies these statements standing alone; she was notified of boiling in retort 85—not 81—and had been told that it was occurring for "the last 6 weeks." Beyond being included on emails, it strains credulity to argue that Ms. Baxter-Krause, who had been president for decades, had a

limited understanding of J.H. Baxter's operations. Her response to the very same sludge email, "Please label it Penta/Creo Process waste," reflects a degree of knowledge and certainty in even the company's waste-streams that extends well-beyond that of a mere figurehead.

Ms. Baxter-Krause is an educated individual with many years of experience with this company, including in the context of environmental compliance as the company's environmental technician. *See* Baxter-Krause PSR at ¶ 81. She did not, herself, pull the physical lever to boil this hazardous waste into the atmosphere. But when faced with the truth of this practice, under her leadership, she chose to obfuscate and minimize. Like the boiling itself, Ms. Baxter-Krause's false statements served to mask J.H. Baxter's illegal hazardous waste practices.

The government respectfully recommends the Court fashion a sentence that reflects the gravity of this series of choices. A sentence of imprisonment of twelve months and one day is sufficient but not greater than necessary to assign a just punishment for misleading regulators about something as significant as hazardous waste management and accounts for Ms. Baxter-Krause's individual history and characteristics, specifically her degree in human biology and longtime leadership of J.H. Baxter. Such a sentence will also serve to deter similar misconduct by either Ms. Baxter-Krause or other similarly situated business owners who would elect to hide their criminal activity or mislead regulators in an effort to cut corners and costs.

/ / /

/ / /

/ / /

**Government's Sentencing Memorandum**                              **Page 21**

**CONCLUSION**

For the above reasons, the government respectfully recommends the Court sentence Ms. Baxter-Krause to twelve months and one day of imprisonment, which represents the low end of the guidelines range, followed by a one-year term of supervised release and a $100 fee assessment for each count. The government further recommends that the Court adopt the parties' jointly recommended fine and impose a total fine of $500,000 against Ms. Baxter-Krause for Counts 3 and 4.

Additionally, the government respectfully requests that the Court adopt the joint-recommendation as to defendants J.H. Baxter & Co., Inc. and J.H. Baxter & Co., A California Limited Partnership, and sentence each entity to a five-year term of probation as well as a $1,000,000 criminal fine to be paid jointly and severally by the co-defendant companies and impose special assessments of $800.

Dated: April 16, 2025

Respectfully submitted,

WILLIAM M. NARUS, CAB #243633
Acting United States Attorney

/s/ William M. McLaren          /s/ Karla G. Perrin
WILLIAM M. McLAREN              KARLA G. PERRIN
Assistant United States Attorney    Special Assistant United States Attorney

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ Rachel M. Roberts           /s/ Stephen J. Foster
RACHEL M. ROBERTS               STEPHEN J. FOSTER
Trial Attorney                  Trial Attorney
Environmental Crimes Section    Environmental Crimes Section